UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PROSPECT YACHT CLUB, LLC                                                                    Plaintiff

v.                                                                     Civil Action No. 3:23-cv-124-RGJ

CARRIER MARINE SERVICES                                                                  Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff Prospect Yacht Club, LLC ("PYC") moves for summary judgment. [DE 19]. Defendant Carrier Marine Services ("CMS") responded, and PYC replied. [DE 21; DE 22]. This motion is ripe. For the reasons below, PYC's motion is **GRANTED in part** and **DENIED in part**.

I.  BACKGROUND

PYC filed its complaint in this Court on March 14, 2023. [DE 1]. PYC and CMS executed a contract on August 9, 2022,[1] in which CMS agreed to provide services to remove a submerged tree trunk and stump from PYC's dock. [*Id.* at 4, ¶ 12]. The contract states:

> [CMS] agrees to provide the following services (collectively "Services") to [PYC] described in detail below: Time and Material per hour with a eight hour minimum. Utilizing a Diver Air Lift and Hydro blast around tree stump and trunk attached, by displacement of sediment. Diver will displace as much material as time is allotted in eight hours. Assisting Oliver Contracting in removal of obstruction to the barge.

[DE 19-1 at 80]. The contract called for PYC to pay CMS $6,400 for these services, to be paid to CMS by the end of the day they provided them. [DE 1 at 4, ¶¶ 13, 15; DE 19-1 at 80]. It also purported to provide CMS with a "maritime lien against the Vessel or vessels, Cargo and or Equipment for all amounts due hereunder, which lien may be exercised even after delivery or

---

[1] CMS signed the contract on August 8, 2022, and PYC signed on August 9, 2022. [DE 1-2 at 16].

1

surrender of the Vessel or vessels, Cargo and or Equipment by [CMS] but will be deemed extinguished upon full payment." [DE 1 at 4, ¶ 14; DE 19-1 at 83, ¶ 16]. The contract also contains a section for "Additional Charges."

> Any changes requested by Customer in the Services at any time shall be compensated by Customer at the rates provided by Carrier Marine Services on the face page of this agreement or in accordance with Carrier Marine Services applicable commercial tariff then in effect. Customer understands Carrier Marine Services may not have had an opportunity to inspect conditions relating to the Services so unknown or unanticipated conditions, changes in laws or required standards or directions by federal or state agencies shall be considered a change requested by Customer. In the event Carrier Marine Services performance is suspended or delayed by Customer, government personnel, weather or any other reason beyond Carrier Marine Services control, Carrier Marine Services shall be paid at the rates identified on the face page of this agreement or in accordance with Carrier Marine Services applicable commercial tariff then in effect for personnel and equipment that is required to standby, including any subcontractor costs, demobilization and mobilization costs, and other costs incurred as a result of such suspension or delay.

[DE 19-1 at 81, ¶ 4].

CMS performed the services outlined in the contract on July 25, 2022 but could not completely remove the tree stump and trunk. [DE 1 at 4, ¶ 16]. Consequently, CMS returned for a second day but was still unable to complete the removal. [*Id.* at 5, ¶¶ 17, 18]. PYC alleges that no additional cost or compensation was discussed prior to CMS returning the second day—a fact that CMS disputes. [*Id.* at 5, ¶ 17; DE 21 at 94]. After CMS remained unable to remove the stump and trunk on the second day, PYC instructed CMS to stop performing work. [DE 1 at 5, ¶ 19]. CMS submitted an invoice to PYC for $12,992[2] and PYC disputed the charge. [*Id.* at 5, ¶ 21]. CMS then claimed to have a maritime lien against the dock and again requested full payment of $12,992 to extinguish the lien. [*Id.* at 5, ¶ 22]. CMS filed a UCC financing statement with the Kentucky Secretary of State on January 5, 2023, which was later amended on March 2, 2023 and

---

[2] This figure was calculated by CMS to include 16 hours of work spread over two days at a rate of $800 per hour, plus interest for late payment. [DE 21 at 92–93, 97].

March 6, 2023. [*Id.* at 5, ¶ 24]. PYC disputes the lien, believing that (1) the dock "does not fit the definition of a vessel under 1 U.S.C.A. § 3," (2) "[t]he UCC Financing Statement is outside of the scope of KRS §355.9-109(4)(b)," and (3) "[t]he Contract does not create a security interest." [*Id.* at 5–6, ¶¶ 23, 25, 26].

PYC brings three claims, each requesting a "declaration of rights." [*Id.* at 6–8]. The complaint seeks: (Claim 1) a judgment "that Defendant has not asserted, and cannot assert a claim for a maritime lien under 46 U.S.C.A. § 31342 because the Structure is not a vessel"; (Claim 2) a judgment that the contract does not establish a security interest, therefore CMS's UCC filing falls outside the scope of KRS § 355.9-109 and is invalid; and (Claim 3) a judgment that PYC owes CMS $6,400 under the contract, not $12,992 as reflected in CMS's invoice. [*Id.* at 6–8, ¶¶ 29–34]. PYC seeks summary judgment in its favor on all three claims. [*See* DE 19 at 73–78].

## II. DECLARATORY JUDGMENT ACT

As an initial matter, it is "well-settled that district courts have discretion 'in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.'" *Acuity v. Jade Enter.*, No. CIV.A. 13-409-KSF, 2014 WL 345411, at *1 (E.D. Ky. Jan. 30, 2014) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)). A court considers five factors to determine whether to exercise this discretion.[3]

> (1) [W]hether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether

---

[3] The Court notes that it undertakes this inquiry of its own accord, as neither party challenges the Court's power to exercise its discretion. *See Travelers Indem. Co. v. Bowling Green Prof'l Assocs., PLC*, 495 F.3d 266, 271 (6th Cir. 2007) (courts may raise jurisdiction under the Declaratory Judgment Act *sua sponte*). Even though PYC seeks a declaratory judgment and CMS asks for the same relief in its Answer and Response, the "parties' wishes" do not "control the district court's exercise of discretion." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 760 (6th Cir. 2014).

3

the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*United Specialty Ins. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  The fourth factor also contains three sub-factors.

> (1) [W]hether the underlying factual issues are important to an informed resolution of the case;
>
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
>
> (3) whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Id.* (quoting *Scottsdale Ins. v. Flowers*, 513 F.3d 546, 560 (6th Cir. 2008)).  The weight of the factors depends on "underlying considerations of efficiency, fairness, and federalism" in light of the facts of the case.  *W. World Ins. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).

### A. First and Second Factors

As to the first and second factors, the controversy in this case is simply over the rights and obligations of the parties pursuant to a contract.  Because "it is almost always the case that if a declaratory judgment will settle the controversy . . . it will clarify the legal relations in issue," the inquiries required by these two factors often overlap substantially.  *Cole's Place*, 936 F.3d at 386 (citations omitted).  That is true here, where determining whether CMS has a maritime lien and whether the contract called for a flat fee or an hourly rate will both settle the dispute and clarify the legal relations in the case.  These factors strongly favor exercising jurisdiction.

### B. Third Factor

The third factor's concerns about "procedural fencing" and a "race for res judicata" are not present in this case. This factor "is meant to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum.'" *Flowers*, 513 F.3d at 558 (quoting *AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004)). Courts "are reluctant to impute an improper motive to a plaintiff where there is no evidence of such in the record." *Id.* "A district court should not deny jurisdiction to a plaintiff who has not 'done any more than choose the jurisdiction of federal rather than state court, a choice given by Congress.'" *Id.* (quoting *State Farm Fire & Cas. Co. v. Odom*, 799 F.2d 247, 250 n.1 (6th Cir. 1986)). Because these concerns are not present in this case, this factor is neutral and does not weigh for or against exercising jurisdiction. *Id.*

### C. Fourth Factor

As to the fourth factor (and its three sub-factors), exercising the Court's discretion will not create friction or improperly encroach on state jurisdiction. First, there is no related state court case in this matter, *see Flowers*, 513 F.3d at 560 (explaining that fourth factor "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action"), and the questions presented are primarily legal, not factual. *See Cole's Place*, 936 F.3d at 400–01. Second, the claims here involve interpretation and application of a federal statute. As a result, a state court would not be better positioned to evaluate them. For that same reason, there is not a close nexus between the issues and underlying state law and policy considerations, and federal law controls the outcome over two of the three claims. Therefore, the fourth factor weighs in favor of exercising jurisdiction.

### D. Fifth Factor

Finally, regarding the fifth factor, no alternative remedy would necessarily be more effective. The Court's inquiry on this factor "must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." *Flowers*, 513 F.3d at 562. The material facts are not in question, and the parties only dispute what those facts mean for their rights under the contract. The Court is not aware of either party seeking any alternative remedy elsewhere, and so this factor also weighs in favor of exercising jurisdiction. Accordingly, because no factors weigh against jurisdiction, the Court finds that exercising its discretion under the Declaratory Judgment Act is appropriate.

## III. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The movant has the initial burden to demonstrate the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "[T]he court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### IV. THE MARITIME LIEN

PYC argues that the contract cannot give CMS a maritime lien because (1) CMS "did not provide any necessaries or work to the dock" itself and (2) the dock "does not meet the definition of a vessel" because it is "not capable of being used as a means of transportation on water," even though it was originally a wooden barge. [DE 19 at 74]. CMS responds that (1) PYC's assent to the contract, which contained a provision for a maritime lien, demonstrates that it believed the dock was subject to a maritime lien, (2) the dock is a vessel because it could be "readily moved" and "is engaged in commerce by pumping fuel aboard [the] vessel and onto boats that visit the dock," and (3) CMS has a maritime lien against the dock as a salvor. [DE 21 at 95–96].

### A. Whether the Dock is a "Vessel"

To begin, whether PYC agreed to a maritime lien in the contract does not have any bearing on whether CMS has one against PYC's dock. A "maritime lien" is a term of art, and one "can arise only by operation of law, and not by the agreement of the parties." *ING Bank N.V. v. Temara*, 203 F. Supp. 3d 355, 362 (S.D.N.Y. 2016) (citing *Bird of Paradise*, 72 U.S. 545, 555 (1866)). The contract purports to create a "maritime lien," but does not define the term suggesting it refers to anything other than its definition under federal statute. [DE 19-1 at 83, ¶ 16]. Accordingly, whether CMS has a maritime lien against the dock turns on whether it is a "vessel" under 1 U.S.C. § 3 and is therefore capable of being subject to a maritime lien under 46 U.S.C. § 31342. [4]

46 U.S.C. § 31342—part of the Federal Maritime Lien Act—prescribes the conditions under which a maritime lien arises:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner–
>
> > (1) has a maritime lien on the vessel;
> >
> > (2) may bring a civil action in rem to enforce the lien; and
> >
> > (3) is not required to allege or prove in the action that credit was given to the vessel.
>
> (b) This section does not apply to a public vessel.

The plain language of the statute requires a structure to be a "vessel" for a party to obtain a maritime lien against it. 46 U.S.C. § 31342(a). Under 1 U.S.C. § 3, the term "Vessel" includes "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489–90 (2005)

---

[4] Courts apply this definition of "vessel" when interpreting the Federal Maritime Lien Act. *See*, *e.g.*, *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864 (11th Cir. 2010); *In re Harbour Lights Marina, Inc.*, 146 B.R. 963 (Bankr. S.D. Ohio 1992).

(explaining that Section 3 "codified the meaning that the term 'vessel' had acquired in general maritime law," which "has remained virtually unchanged from 1873 to present").

While it is undisputed that PYC's dock is not regularly "used . . . as a means of transportation on water," the parties disagree as to whether it is "capable of being used" for that purpose. 1 U.S.C. § 3. The Supreme Court has explained that while Section 3 "does not require that a watercraft be used primarily for [transportation over water]" to be a vessel, the central question remains whether use for that purpose "is a practical possibility or merely a theoretical one." *Stewart*, 543 U.S. at 495, 496; *see also Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 121 (2013) ("[W]e must apply this definition in a 'practical,' not a 'theoretical,' way."). Thus, "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to . . . physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Lozman*, 568 U.S. at 121, 128 (explaining that a court must view the "physical attributes" and "behavior" of the dock as "objective manifestations of any relevant purpose").

Another division of this Court has considered a similar question in *Thomas v. Riverfront Limestone, LLC*, No. 5:14-CV-191-TBR-LLK, 2018 WL 1413342 (W.D. Ky. Mar. 21, 2018). Although that case involved a claim under the Longshore and Harbor Workers Compensation Act, it still required interpretation of 1 U.S.C. § 3's definition of "vessel." *Id.* at *2–4. In *Thomas*, the structure in question was "originally designed and built in the 1960's" to transport flammable liquid but was converted to be "a dock used as a platform for loading and unloading cargo from barges." *Id.* at *3. To do so, the structure was modified by removing "pumping and piping equipment" and installing a permanent ramp to allow trucks to drive onto the structure. *Id.* Due to "worn and thin plating," it was fit for use as a dock but not for "general transportation." *Id.*

Ultimately, although the structure still had a "raked bow," was "not permanently attached to shore or connected to onshore utilities," and could "be removed from shore within one hour," the *Thomas* court held the dock was not a vessel because although it "was originally designed for transportation in the 1960's, its design was modified and it is no longer used for that function." *Id.* at *4.

PYC argues this case is directly analogous to *Thomas*. It asserts that its dock has "no propulsion or steering systems," has "a permanent ramp installed that connects with the shore," has "removed all deck fittings," has "a bar and restaurant to serve customers," "contains a fuel station," has been "permanently fixed in place with large steel cables that are not removable," and "has been similarly situated for approximately 30 years." [DE 19 at 74–75]. In its reply, PYC reemphasizes that the dock "holds a bar, restaurant, and other buildings/fixtures."[5] [DE 22 at 129]. The Court agrees this case is analogous to *Thomas* and that PYC's dock is not a vessel under 1 U.S.C. § 3. CMS argues that the dock is a vessel because "[PYC] admitted that the LASH barge dock could be readily moved, and that [PYC] is engaged in commerce by pumping fuel aboard their vessel and onto boats that visit the dock." [DE 21 at 96]. Similar arguments have been rejected by other cases interpreting Section 3.

First, even though the structure in *Thomas* was regularly moved "between ramps," the court distinguished that it was "not [used] to transport cargo from one place to another." *Thomas*, 2018 WL 1413342, at *4. Even though it was originally designed for that, it was "modified" and no longer transported any cargo or people. *Id.* at *3–4. The Supreme Court reached the same conclusion in *Lozman*, where "[b]ut for the fact that it floats, nothing about [the plaintiff's] home suggest[ed] that it was designed to any practical degree to transport persons or things over water." *Lozman*, 568 U.S. at 122. The structure in *Lozman* was also modified from its original form as a

---

[5] These fixtures can be seen from the Google Maps photograph attached to PYC's motion for summary judgment, as well as the ramp connecting to the shore. [DE 19-2 at 86].

houseboat and lacked "self-propulsion." *Id.* Even though it was capable of being towed and had been towed four times over a seven-year period, nothing about the home "could lead a reasonable observer to consider it designed to a practical degree for 'transportation over water.'" [6] *Id.*; *see also Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 21 (1926) (holding that a "wharfboat"—a structure used to transfer cargo between ships and docks and ships and other ships, and capable of being towed—was not a "vessel"); *Cope v. Vallette Dry–Dock Co.*, 119 U.S. 625, 627 (1887) (holding that a floating drydock permanently fixed to a wharf was not a "vessel"). Contrast that with *Stewart*, which held that a dredge was a vessel which had a "captain and crew, navigational lights, ballast tanks, and a crew dining area," moved "every couple of hours," and "served a waterborne transportation function" by carrying "machinery, equipment, and crew over water." *Stewart*, 543 U.S. at 484–85, 491–92; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995) (holding that a barge that alternated between being anchored as a work platform and being used for transportation was a "vessel"). PYC's dock is similar to the structures in *Thomas* and *Lozman* and shares none of the distinguishing characteristics of the dredge in *Stewart*. Accordingly, even accepting CMS's assertion that the dock could be "readily moved," this alone does not make the dock a "vessel."

Second, engaging in "interstate commerce" by selling fuel, food, and drinks from the dock can hardly be considered transporting goods over water for the purposes of 1 U.S.C. § 3. [DE 21 at 94]. In *Thomas*, even though the structure physically moved and transported equipment between

---

[6] *Lozman* rejected an "anything that floats" method. 568 U.S. at 126.
> [A] wooden washtub, a plastic dishpan, a swimming platform on pontoons, a large fishing net, a door taken off its hinges, or Pinocchio (when inside the whale) are not "vessels," even if they are "artificial contrivance[s]" capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so.

*Id.* at 121. Instead, *Lozman* emphasized the "transportation on water" language of 1 U.S.C. § 3, building on *Stewart's* distinction between "practical" and "theoretical." *Id.* (citing 543 U.S. at 496).

11

ramps, the court held this was not the "type of 'transportation' meant by the statute." 2018 WL 1413342, at *3. Here, CMS does not argue that PYC's dock moves at all, only that it *could* be moved if necessary. [DE 21 at 94 ("The dock is not permanently moored and can be readily moved.")]. Gas pumps and restaurants serving food could also be viewed as "mere appurtenances" rather than "cargo." *Lozman*, 568 U.S. at 129–30. And, in any event, the dock does not transport the fuel or food somewhere *else* to be sold; instead, the fuel and food are transported to PYC to be sold *on the dock*. Because the dock is the destination for these goods, not the means of transportation, this argument is unavailing.

Even viewing the facts in the light most favorable to CMS, there is no genuine dispute as to whether the dock is a "vessel" as a matter of law.[7] "Not *every* floating structure is a 'vessel,'" and PYC's dock lacks the hallmarks of a structure that a "reasonable observer" would find "designed to a practical degree for carrying people or things over water." *Lozman*, 568 U.S. at 121 (emphasis in original).

### B.  Whether CMS Qualifies as a "Salvor"

CMS argues it has an alternative basis for a maritime lien against the dock—that it is a salvor. It explains, "[w]ith its origins in antiquity, the basis of salvage is that a person helping another at sea is putting himself and his vessel at risk and should be appropriately rewarded." [DE 21 at 96]. This argument fails because, as PYC correctly asserts, "a party performing a contractual duty is not a salvor." [DE 22 at 130]. As the Sixth Circuit has explained:

> [I]t is a fundamental principle of admiralty that one who provides services pursuant to a contract of employment may not be considered a "pure" salvor. Contract salvors are not entitled to a number of special protections afforded to pure salvors, including the right to a salvage award and *the right to seize a vessel pending payment*.

---

[7] Because the Court finds this issue dispositive as to whether CMS has a maritime lien, it does not reach PYC's argument that CMS did not provide "necessaries" to the dock itself. [DE 19 at 74].

*Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 622 (6th Cir. 2013) (emphasis added). CMS performed its services pursuant to a contract. As a result, it is not a salvor. Even if CMS was not employed by PYC via contract, its services still would not meet the "long-accepted definition" of "salvage":

> Salvage is well defined as the compensation allowed to persons by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict capture, or other marine misadventures.
>
> Other jurists define it as the service which volunteer adventurers spontaneously render to the owners, in the recovery of property from loss or damage at sea under the responsibility of making restitution and with a lien for their reward.
>
> Persons who render such service are called salvors, and a salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel.
>
> Enough appears in those definitions to show that the elements necessary to constitute a valid salvage claim are as follows: (1.) A marine peril to the property to be rescued. (2.) Voluntary service not owed to the property as matter of duty. (3.) Success in saving the property or some portion of it from the impending peril.

*Id.* (quoting *The Claritia and the Clara*, 90 U.S. 1, 16 (1874)). CMS's services do not remotely resemble this definition because, *inter alia*, they were not "spontaneously render[ed]," they did not provide "assistance [to] a ship or vessel," and they were not "without any particular relationship to" PYC. *Id.* Because CMS is plainly not a salvor and PYC's dock is not a vessel, PYC's motion for summary judgment on its first claim is **GRANTED**.

### C. Whether the Contract Creates a Security Interest

PYC argues that the contract does not create a security interest because it "does not mention a security interest or collateral throughout the entire document," therefore CMS's UCC filing is "invalid." [DE 19 at 76]. It asserts that KRS 355.9-109 expressly "does not apply to: A lien, other

13

than an agricultural lien, given by statute or other rule of law for services or materials[.]" [*Id.* (quoting KRS 355.9-109(4)(b))]. Furthermore, it argues that "a security interest is only enforceable when the debtor has authenticated a security agreement that provides a description of the collateral" under KRS 355.9-203(2)(C)(1). [*Id.*]. CMS offers no response to this argument and conceded as much in its responses to PYC Interrogatories attached to CMS's response.

> REQUEST NO. 7: Admit that the Contract does not establish a security interest in the Structure or any of Plaintiff's property.
>
> RESPONSE: CARRIER denies and asserts that it does have a maritime lien on Plaintiff's dock.
>
> REQUEST NO. 8: Admit that the UCC Financing Statement filed by you with the Kentucky Secretary of State on or about January 5, 2023, which was thereafter amended on March 2, 2023 and March 6, 2023, is invalid.
>
> RESPONSE: CARRIER admits.

[DE 21-1 at 105]. Thus, CMS only asserts that it had a security interest by way of its maritime lien, not an independent security interest created by contract. In its response, it only argues that PYC is "not entitled to judgment as a matter of law on claims 1 and 3." [DE 21 at 97]. Accordingly, because the Court has already found that CMS does not have a maritime lien on the dock, and CMS does not contest that it has a security interest via any other means, PYC's motion for summary judgment on its second claim is **GRANTED**.

### V. AMOUNT DUE UNDER THE CONRACT

PYC argues that it owes CMS $6,400, not $12,992, because "the contract states the total contract amount at $6,400." [DE 19 at 76]. It asserts that, when interpreted "by looking solely to the four corners of the agreement," the contract contemplated "a flat fee for the tree stump and trunk removal." [*Id.* (citing *Boodram v. Coomes*, No. 19-5313, 2019 WL 8333521, at *5 (6th Cir. Dec. 23, 2019))]. In the alternative, it argues that the contract is "ambiguous," meaning it should

be "construed against the drafter." [*Id.* at 77 (citing *Hackney v. Lincoln Nat'l Fire Ins.*, 657 F. App'x 563, 572 (6th Cir. 2016))]. CMS responds that the contract is "not for a flat rate and is not ambiguous." [DE 21 at 97]. It points out that the contract "stat[es] that it is a time and material contract with an hourly rate," leading to only one possible interpretation. [*Id.*].

Under Kentucky law, contract interpretation begins "with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). "When no ambiguity exists in the contract, [courts] look only as far as the four corners of the document to determine the parties' intentions." *3D Enter. Contracting Corp. v. Louisville and Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005)); *see also Hackney*, 657 F. App'x at 572 (citing *Frear v. P.T.A. Indust., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)) ("When the language in a contract is clear and unambiguous, the language's plain meaning controls this inquiry."). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins.*, 94 S.W.3d 381, 385 (Ky. App. 2002)). "If the language is ambiguous, the court's primary objective is to effectuate the intentions of the parties." *Dunaway*, 490 S.W.3d at 694 (citing *Cantrell Supply, Inc.*, 94 S.W.3d at 384)).

Immediately at the beginning of the "Description of Services," the contract states the agreement is for "Time and Material *per hour* with a eight hour minimum." [DE 19-1 at 80 (emphasis added)]. It is also clear that the contract does not describe a flat fee for completion of the job. Instead, it states "Diver will displace *as much material as time is allotted in eight hours*." [*Id.* (emphasis added)]. Below the description, the contract states the total cost of these services is $6,400. This section contains the only language in the contract describing the services and the costs of services. Accordingly, the Court concludes that the contract created an hourly rate, not a

flat fee structure. *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 687 (Ky. 2012) ("In the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.") (citation and internal quotation marks omitted).

PYC's argument that "there is no mention of hourly work beside the total price" is wholly unsupported. [DE 19 at 76]. While the contract does not spell out that the cost is $800 per hour, there is nothing ambiguous about the description of services as "Time and Material *per hour*." [DE 19-1 at 80 (emphasis added)]. It explicitly charges PYC for eight hours of work, not the completion of a job, and even requires an eight-hour minimum. [*Id.*]. And PYC can point to no language in the contract suggesting a flat rate for the entire removal process. It argues that the $6,400 "Total" refers to the total price for the entire job. But a fair reading of the plain language leads to the conclusion that the $6,400 refers merely to the total charge for the eight hours of work in the "Description of Services." It does not create a cap on cost for future work by implying $6,400 is the sum total for all services provided, but only totals the cost for the agreed upon eight hours. By simple arithmetic, it is apparent then that the hourly rate was $800 per hour.

The only question remaining is how this interpretation can be applied to the second day of services provided by CMS—something not expressly provided for in the contract. The "Additional Charges" section of the contract requires that "Any changes requested by Customer in the Services at any time shall be compensated by Customer at the rates provided by [CMS] on the face page of this agreement[.]" [DE 19-1 at 81, ¶ 4]. Requesting more than the original eight hours of work constituted a "change" in the Services (which originally only included eight hours of work), and so PYC is required to compensate CMS at the same "rates provided by [CMS] on the face page of [the] agreement," which are located in the "Description of Services." That rate

16

was $800 per hour, so another eight hours of work amounted to a total cost of $12,800. Additionally, the contract required that "Late payments shall earn interest at the rate of 1.5% per month, or the maximum amount permitted by law, whichever is less." [DE 19-1 at 81, ¶ 5].

It is undisputed that PYC requested CMS to return for a second day of services, and then asked CMS to stop providing services after it had completed 16 hours of work. [DE 21-1 at 109]. As CMS explained in its response to a PYC interrogatory:

> At the end of the first day of services, Oliver and CARRIER met with Kevin Medley to report the results of their activity during the first day. Kevin Medley stated to Oliver and CARRIER that the work needed to continue, he stated, "This project must get done." Later in the evening of the first day, Kevin Medley told Oliver that he had official authorization for the work to continue for the second day. Thereafter, Oliver passed the word to CARRIER and instructed him to return to the dock for a second day of services. At the end of the second day of services, CARRIER was instructed by Plaintiff to cease operations and not return for a third day. CARRIER provided services for two days (16 hours) at the agreed-to rate of $800 per hour which equals $12,400.00. Thereafter, interest on outstanding balance was applied in accordance with Section 5 of the written contract, resulting in a current balance due of $15,985.85.

[*Id.*]. In its reply, PYC does not dispute that this conversation occurred, asserting only that "[CMS] does not present any arguments that the Contract was modified or amended after signing, so the Court may establish and adjudicate the payment amount by simply looking to the plain language of the Contract," and "[CMS] did not ever explain to [PYC], or include in the Contract, that [it] would be charging [PYC] an additional eight hundred dollars an hour to finish the work under the Contract." [DE 22 at 126, 131]. Even assuming *arguendo* that PYC's assertion is true—that no discussion of additional charges occurred before the second day of services [DE 1 at 5, ¶ 17]—none were necessary because (1) PYC does not dispute that it requested CMS to return for the second day and (2) the plain language of the contract provided for an hourly rate, and requesting additional hours of service constituted a "change" under the contract subject to the same hourly rate. Therefore, CMS would be entitled to payment of $12,800 for services provided, with

17

applicable interest for late payment consistent with the rate established by the contract. PYC's motion for summary judgment is **DENIED** on its third claim.

In its Answer and Response, CMS requested "that [PYC] be required to pay the full amount due to CMS under the contract" with unpaid interest. [DE 17 at 68; DE 21 at 97–98]. While "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court," *Frear*, S.W.3d at 105 (quoting *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000)), and the Court's analysis leaves no "genuine issue" on this claim, *Anderson*, 477 U.S. at 249, CMS never asserted a counterclaim in its Answer. [*See generally* DE 17]. Therefore, the Court cannot grant a declaratory judgment in CMS's favor. In the alternative, CMS requests "that the Complaint be Dismissed with Prejudice." [DE 21 at 98]. Because no issues remain to be decided, the Court will **DISMISS** PYC's third claim.

## VI. CONCLUSION

For the reasons explained, and the Court being otherwise sufficiently advised, PYC's motion for summary judgment [DE 19] is **GRANTED in part** and **DENIED in part** as set forth above. The Court will enter a separate Judgment consistent with this Memorandum Opinion and Order.

Rebecca Grady Jennings, District Judge
United States District Court

August 14, 2024

cc: counsel of record